**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

STEVEN F. LARSEN,

      Plaintiff,

vs.                                CASE NO. 8:07-CV-00442-T-17-TBM

AIRTRAN AIRWAYS, INC.,

      Defendant.

_____/


## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This cause is before the Court on Defendant's Motion for Summary Judgment, filed on

December 22, 2008 (Dkt. 40), and Plaintiff's Opposition Response thereto filed on January 20,

2009 (Dkt. 44). For the reasons set forth below, the Defendant's Motion for Summary Judgment

is **DENIED**.


## PROCEDURAL HISTORY

Plaintiff, STEVEN F. LARSEN (hereinafter "Larsen"), filed a complaint (Dkt. 1) against

the Defendant, AIRTRAN AIRWAYS, INC. (hereinafter "AirTran"), on March 12, 2007, and

subsequently filed a First Amended Complaint (Dkt. 12) on March 29, 2007. This dispute arises

from the Collective Bargaining Agreement (hereinafter "CBA") between AirTran and its

employees, specifically a clause in the agreement that guarantees employees Long Term

Disability (hereinafter "LTD") protection. In the three-count First Amended Complaint, Larsen

sought relief for a breach of an employment contract and a violation of the Employment Retirement Income Security Act (ERISA) sec. 502(a)(3). In the complaint, Larsen asked the Court to clarify his rights as a plan participant and he sought to recover benefits due under the plan pursuant to ERISA. Larsen also asked the Court to enter an injunction to forbid acts and practices that violate the terms of the plan, to enforce terms of the plan and for damages caused by breach of the employment contract.

In response to the First Amended Complaint, AirTran filed a Motion to Dismiss (Dkt. 24) pursuant to Fed. R. Civ. P. 12(b)(1) and (6). In its motion, AirTran argued that this case requires the application or interpretation of a CBA and is, thus, governed by the requirements of the Federal Railway Labor Act (RLA), 45 U.S.C. § 184, and, therefore, not subject to adjudication in the federal courts. AirTran further argued that this is a "minor dispute" under the RLA concerning the CBA and is subject to resolution procedures provided by the RLA. Additionally, AirTran filed a Motion to Stay (Dkt. 26). In it, AirTran asked the Court to stay this action pending the decision of a System Board of Adjustment on this same matter. AirTran argued that this board, part of the grievance process provided by the CBA, is the proper decisional body in this case.

Larsen filed a Response in opposition to both motions. (Dkt. 28). Larsen argued this Court has jurisdiction based on exceptions to the RLA that allow jurisdiction under a CBA to fall to district courts if (1) an employer repudiates the CBA grievance machinery; (2) when resort to the machinery would be futile; and (3) the dispute is a "major dispute" and, thus, adherence to the grievance machinery is not required.

The Court, after duly considering these filings, denied both motions. (Dkt. 31). The Court agreed with AirTran that the disputes here fell under the scope of the RLA and were "minor." However, the Court found it retained jurisdiction because the facts of this case fell within the exceptions to the general rule highlighted by Larsen. Specifically, the Court found that AirTran repudiated the grievance machinery and that Larsen's further resort to grievance procedures under the CBA would be futile. The Court held that because Larsen raised concerns of prejudice and unfairness that are material enough to invoke the exception to the RLA preemption rule, he has alleged a sufficient basis for subject matter jurisdiction.

Following the denial of its motions, AirTran filed its Answer and Affirmative Defenses to Larsen's First Amended Complaint. (Dkt. 32). In it, AirTran renews its assertion that Larsen's claims are "minor disputes" preempted by the RLA, and, thus, the Court is divested of subject matter jurisdiction in favor of the System Board of Adjustment. AirTran also claimed that Larsen failed to exhaust administrative remedies required by the RLA, and that his detrimental reliance claim fails because the reliance was unreasonable under the circumstances and because an express contract exists. AirTran also claimed that to the extent detrimental reliance is premised on oral promises not contained in the CBA it fails because promissory estoppel is not controlling on alleged oral employment contracts, and that detrimental reliance fails because refusal to enforce an alleged promise would not virtually sanction the perpetration of fraud or result in other injustice in this case.

Subsequently, AirTran filed its Motion for Summary Judgment and Incorporated Memorandum of Law (Dkt. 40) pursuant to Fed. R. Civ. P. 56(b), M.D. Fla. Local Rule 3.01 and 45 U.S.C. § 151a, *et seq*. AirTran makes four arguments for summary judgment: (1) The RLA divests this Court of subject matter jurisdiction because Larsen's claims are "minor disputes"

preempted by the act; (2) Larsen failed to exhaust his administrative remedies or establish facts sufficient to invoke the "repudiation" or "futility" exceptions to RLA preemption; (3) Larsen's contract claim is not supported by the plain language of Section 11.C of the CBA, and even if this section were ambiguous, extrinsic evidence shows that the LTD insurance purchased by AirTran is faithful to what the union bargained for when the agreement was created; and (4) Larsen's promissory estoppel claim fails because (i) an express contract on the LTD benefit exists and (ii) the reliance Larsen alleges was unreasonable as a matter of law. The following facts are taken as true for the purpose of resolving the pending motion.


## FACTS

Larsen worked as a commercial airline pilot for AirTran, a commercial airline with ticketing and flight operations in Sarasota County. Larsen began work in this capacity in February, 2005. As a part of his employment, he was the beneficiary of the CBA between his union, the National Pilots Association (hereinafter "union") and AirTran. He was also a participant in an employee benefit plan within the meaning of ERISA.

Months after he began work with AirTran, Larsen suffered health problems, specifically with his heart. Because of this malady, he no longer met the Federal Aviation Administration's requirements for a medical certification necessary to allow him to fly commercial airliners. As such, he could not perform his job. While his condition improved to the point where he was asymptomatic, Larsen chose for medical and financial reasons not to undergo a procedure required by the FAA before it would consider granting the medical certificate necessary to allow him to return to the cockpit. Believing he was medically unable to fly, Larsen attempted to claim benefits from the insurance carrier for AirTran's LTD plan. The carrier denied his claim and

appeals, classifying his job as a pilot as "light duty" for which he was medically capable of returning to work, and placing blame on Larsen for not undergoing the procedure that would allow him to return to work. (Dkt. 40, Exhibit A).

Disability insurance for AirTran employees is governed by CBA 11.C (Dkt. 40, Exhibit C). That clause states:

> 1. A pilot who is on an extended medical leave of absence in accordance with Section 9 of this Agreement, and if requested can show verification by a qualified aeromedical examiner of unfitness for duty, is entitled to receive Disability pay of 50% of the Monthly Guarantee from the Company in accordance with the table below: (*table omitted*)

> 2. Long Term Disability Insurance will be provided by the Company to all pilots covered under this agreement until the age of sixty-five (65), with benefits not less than those in effect on the date of the signing of this Agreement. The Company will pay the cost for coverage of fifty percent (50%) of the pilot's normal pay. Effective January 1, 2002, the Company will pay the cost for coverage of two thirds (2/3) of the pilot's normal pay.

AirTran states that it does not administer the LTD benefit, nor does it maintain discretionary authority of eligibility determinations. The company merely purchases and pays premiums on the plan. If a grievance arises, according to the CBA, a pilot must first attempt to "discuss the issues" with the Director of Flying. (Dkt. 44, ¶ 14) If that fails, the pilot next discusses the issues with the union. *Id.* If the union agrees there has been a violation, it will submit a grievance to the Director of Flying on the pilot's behalf. *Id.* If the subsequent decision is not satisfactory, the union may at its sole discretion submit the case to the vice president-flight operations. *Id.* If the union is again unsatisfied with the response, the union may at its sole discretion submit the grievance to the System Board of Adjustment for consideration. *Id.* That board consists of four members, two appointed by the union and two by AirTran. *Id.*

Larsen alleges that he sought to appeal the denial through the grievance procedure in the CBA. He alleges that he initially tried to contact AirTran's Human Resources department countless

times but received no response. (Dkt. 43, ¶ 7) He sent an initial letter to the Director of Flying asking for his assistance. (Dkt. 40, Exhibit A, 21:9-11). Larsen received no response. *Id.* at 21:23. Now having retained legal counsel, he sent a second letter, again with no response from either the Director of Flying or the union, which was also furnished a copy. *Id.* at 22: 23-25; 23: 7-8. Larsen then spoke to the Director of Flying on the telephone. *Id.* 23:23-25. The Director of Flying was allegedly incredulous that the benefits had not been paid, and promised to "look into it." *Id.* 24:9-11. Larsen alleges that a month passed with no response, and he contacted the Director of Flying again. *Id.* at 24:13-15. The process with him proceeded no further. *Id.* at 24:18-19.

At about the same time, Larsen alleges that he spoke with the president of the union on the telephone. *Id.* at 25:1. The union president promised a conference call with Laura Backus, the union general counsel, on the following day. *Id.* at 25:5-6. Larsen alleges he called back on the predetermined date and time, but that both officials were unable to be located. *Id.* at 25:9-10. Larsen alleges that he left a voicemail, but never received a response from the union president. *Id.* at 25:14. However, Larsen alleges that he did receive a telephone call from Backus. *Id.* at 25:17. He was berated, he alleges, for several minutes. *Id.* at 25:22-25. About thirty (30) minutes later, Larsen alleges a much more cordial Backus called back, and directed him to an employee of the human resources department. *Id.* at 26:9-12. Larsen said he left at least three voicemails for that person, and received no response, and never subsequently spoke to her. *Id.* at 26:14-18.

Next, Larsen attempted to contact the vice president of the human resources department. *Id.* at 27:4-6. That official's secretary suggested that he contact another human resources employee. *Id.* at 27:8-11. Again he reached a voicemail, but received no returned call. *Id.* at 27:13-14. Larsen states that he never spoke with anyone in the union or AirTran about his LTD. *Id.* at 28:2-4. He did

speak to human resources employees about other issues, but they would not talk to him about his LTD. *Id.* at 28:11-13.

**STANDARD OF REVIEW**

Under Fed.R.Civ.P. 56(c), summary judgment is granted where "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." "An issue is not genuine if it is unsupported by evidence or is created by evidence that is 'merely colorable' or 'not significantly probative.'" *Farell v. Reno*, 983 F.Supp. 1099, 1104 (M.D.Fla. 1997) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "A fact is not material unless it is identified by the controlling substantive law as an essential element of the nonmoving party's case." *Id.* (*citing Anderson* 477 U.S. at 248). "All doubt as to the existence of a genuine issue of material fact must be resolved against the moving party." *Insurance Co. of North America v. Perreault*, 789 F.Supp. 381, 385 (M.D.Fla. 1992) (*citing Hayden v. First National Bank of Mt. Pleasant*, 595 F.2d 994, 996-997 (5th Cir. 1979)).

In deciding a motion for summary judgment, the Court reviews the record and draws reasonable inferences "in the light most favorable to the non-moving party." *Moorer v. City of Montgomery*, 293 Fed.Appx. 684, 687 (11th Cir. 2008) (*citing Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1357 (11th Cir. 2005)). On the other hand, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Id.* (*quoting Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005)). Under Fed.R.Civ.P. 56(e), the adverse party "may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If

the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party."

"The stringent burden of establishing the absence of a genuine issue of material fact lies with the moving party." *Farrell*, 983 F.Supp. at 1104 (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "The Court should not grant summary judgment unless it is clear that a trial is unnecessary and any doubts in this regard should be resolved against the moving party." *Id.* (*citiding Anderson*, 477 U.S. at 255; *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). "To discharge this burden, the movant must point out to the Court that there is an absence of evidence to support the nonmoving party's case." *Id.* (*citing Celotex*, 477 U.S. at 325).

"After the movant has met its burden under Rule 56(c), the burden of production shifts and the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Id.* (*quoting Matsushita Electronic Industrial Company v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). The non-moving party must come forward with "specific facts showing that there is a genuine issue for trial." *Id.* "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be a sufficient showing that the jury could reasonably find for that party." *Id.* at 1105 (*quoting Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990)).

## DISCUSSION

### A. AirTran argues that Larsen's claims are "minor disputes" which are preempted by the RLA, which divests this Court of subject matter jurisdiction.

That Larsen's claims are "minor disputes" preempted by the RLA is precisely what the Court held in its denial of AirTran's earlier Motion to Dismiss (Dkt. 31). In reaching its decision, the Court found the following: The cardinal rule is that, when an employee of an air carrier asserts claims that require the application or interpretation of a CBA "made and maintained"

pursuant to the requirements of the RLA, such claims are not subject to adjudication in federal courts. Rather they are subject to the exclusive remedies provided in the RLA. An action taken by an air carrier employer that is "arguably justified" by a CBA is also a "minor dispute" and is subject to the exclusive jurisdiction of the board of adjustment. *Consol. Rail Corp. v. Ry. Labor Executives' Ass'n*, 491 U.S. 299, 306-307 (1989). Further, substantive statutory prohibitions against retaliation or discrimination and claims that require "application or interpretation of a collective bargaining agreement" are disputes that are subject to different forums for resolution. *Hawaiian Airlines v. Norris*, 512 U.S. 254-255 (1994). The former may be litigated in the judicial context, but claims that require application or interpretation of any agreement are left exclusively under the minor dispute resolution procedures of the RLA. *Pyles v. United Air Lines, Inc.*, 79 F.3d 1046 (11th Cir. 1996).

The Court found that the plaintiff's entire claim was premised on his allegation that he was entitled to pursue his grievances, pursuant to the CBA. The Court, thus, regarded Larsen's claims to be a minor dispute and subject to exclusive adjustment under RLA procedures. *Consol. Rail Corp.*, 491 U.S. at 309-310.


**B. AirTran argues that Larsen failed to exhaust his administrative remedies, or establish facts sufficient to invoke the "repudiation" or "futility" exceptions to RLA preemption.**

In its order on AirTran's Motion to Dismiss, the Court applied the rule stated in *Capraro v. UPS*, 993 F.2d 328 (1993), that the general rule of RLA preemption may be defeated by a number of exceptions even when a plaintiff relies on the interpretation and application of the CBA. Those exceptions include "when the employer repudiates the private grievance machinery" and "when resort to administrative remedies would be futile." Futility and

repudiation as exceptions have been cited in this circuit by *Pyles*, 79 F.3d at 1053. The Court held in its earlier ruling that the facts of this case fell under these two exceptions, and, thus, found jurisdiction existed in the federal courts despite the general RLA rule that it does not. AirTran, in its Motion for Summary Judgment, asks the Court to restrict this previous holding to the Motion to Dismiss and to find that the exceptions have "failed to withstand discovery."

In support of its assertions, AirTran makes the following arguments: (1) AirTran did not repudiate the exclusive grievance resolution procedures contained in the Agreement simply by not responding to Larsen's request for a meeting; (2) The CBA was not repudiated, but applied by both AirTran and the union, and neither believed Larsen's grievance had merit. (3) Larsen has a remedy where he believes the union is improperly interfering with his rights to a minor dispute before the System Board of Adjustment.

### 1. AirTran claims it did not repudiate the exclusive grievance resolution procedures in the CBA simply by not responding to Larsen's request for a meeting

Contract repudiation exists "when the conduct of the employer amounts to a repudiation of contractual procedures." *Vaca et al. v. Sipes*, 386 U.S. 171, 185 (1986). When such a situation occurs, the employee "should not be limited to the exclusive remedial procedures established by the contract." *Id.* "In such a situation (and there may be others), the employer is estopped by his own conduct to rely on the unexhausted grievance and arbitration procedures as a defense to the employee's cause of action. *Id.*

Under the CBA 14(1)(a) (Dkt. 44, ¶ 14), the first step in the grievance process for an AirTran pilot is to discuss the issue with the Director of Flying. The Court, in its Order on AirTran's Motion to Dismiss, found that the Director of Flying's failure to convene a meeting to discuss Larsen's problem after two written requests "cannot be said to be inadvertent."

Repudiation is buttressed by Larsen's deposition, submitted with the Motion for Summary Judgment, and his affidavit (Dkt. 43), which illustrate Larsen's dizzying attempts to get someone at AirTran, whether the Director of Flying or a human resources employee, to have a meaningful conversation with him about the LTD (or even return his calls in many instances). Also, Larsen indicated his initial contact with the Director of Flying during which Larsen was assured the matter would be looked into ended abruptly when the director suffered his own medical problem. (Dkt. 44, Exhibit A, 24:16-18). No further contact by the director himself, or someone in his place, was apparently attempted. *Id.* at 24:18-19. AirTran points to no additions to the record following discovery, nor can the Court find any products of discovery, that would change its earlier opinion. Instead, the Larsen deposition makes it clear that AirTran's conduct frustrated Larsen's attempts to exercise the CBA, and AirTran is thus estopped from relying on the CBA's grievance procedures to halt the current action.

AirTran's only authority on this point is a case out of the Eighth Circuit, *Martin v. American Airlines, Inc.*, 390 F.3d 601 (8th Cir. 2004). AirTran lifts a quote from the case stating that "simply alleging that the airline ignored his petition is not enough to show repudiation" without offering any context. *Id.* at 609. The fact pattern of *Martin*, which involves a similar airline/employee dispute, is easily distinguishable from this case. *Martin* involved an employee attempting to pursue arbitration without the help of his union. *Id.* The employee, however, did not make the airline aware that he was pursuing arbitration without the union. *Id.* Further, the employee did not send the airline the individual petition in accordance with the arbitration procedures in his CBA. *Id.* Even if this Court were to adopt a case from another circuit, the plaintiff in that case did not follow his CBA while Larsen made an attempt to, an attempt which this Court has held was thwarted. They are inapposite.

**2. AirTran claims that AirTran and the union applied the CBA, and that neither AirTran or the Union believed Larsen's grievance had merit under the "law of the shop."**

The CBA, in Section 14(a)(1) (Dkt. 43, ¶ 14), requires that pursuant to a dispute a pilot will first discuss the issues surrounding the dispute with the Director of Flying for possible resolution. If a resolution does not occur, under 14(b) the pilot will discuss the dispute with the union. If the union agrees there has been a contract violation, it will submit a grievance to the Director of Flying in writing. After a subsequent set of procedures, the union may, under 14(d), at its sole discretion, submit the matter to the System Board of Adjustment.

AirTran argues that when the union has perceived a discrepancy between the CBA and the LTD plan purchased by AirTran, it has initiated the System Board of Adjustment procedure. Therefore, AirTran argues, it has developed the "common law of the shop" contemplated for this procedure in *Conrail*, 491 U.S. at 311; *Capraro* 983 F.2d at 332. This "common law of the shop" allowed both AirTran and the union to determine that Larsen did not have a meritorious claim, AirTran argues. Therefore, after they were properly contacted by Larsen according to the CBA, they responded appropriately.

This again debates a conclusion reached by the Court in the earlier Order on AirTran's Motion to Dismiss without offering additional evidence that causes the Court to rethink its earlier reasoning. The Court previously found that the Director of Flying failed to respond to repeated requests to convene a meeting to discuss the grievance. Additionally, this Court found that the union mostly frustrated Larsen's attempts to communicate with it. What communication Larsen did have with the union was mostly in the form of a verbal assault.

It's hard to contemplate that a belittling tongue-lashing and a spate of frustrated attempts to communicate are, as AirTran dubiously argues, "conversations that the Union did not agree with his position." It's hard to get any read at all on AirTran's position when the company won't convene meetings or even pick up the telephone. The record doesn't even fully represent all of Larsen's frustrated attempts at communication because AirTran's attorney stopped Larsen as he was listing his journey through the AirTran Human Resources department's telephone lines. (Dkt. 40, Exhibit A, 27:15-18). The furthest he got with the union was a telephone conversation with the union president some time after the tongue-lashing from the union general counsel in which he was again told things would be looked into. *Id.* at 29:20-23. Again, nothing further came from the conversation. *Id* at 29:23-24. From the record, the Court can find no evidence that either the union or AirTran gave Larsen a definitive opinion on the merits of his case, offered a definitive meeting date or told him when he might expect an opinion. The best they did was put him off. Most of the time, it seems they tried to ignore him.

Larsen's communications with the Director of Flying and the union both ended with promises to look into it further, and then silence. This is hardly a statement from either party on their feelings of the merits of the claim. AirTran offers no additional evidence that would upset the Court's earlier ruling that Larsen was met with repudiation and futility, and, thus, meets the exceptions to the RLA requisite to allowing the Court to find subject matter jurisdiction.

**3. AirTran argues against a futility exception because it claims Larsen has a remedy where he believes the union is interfering with his rights to a minor dispute before the System Board and that Larsen has failed to state facts that meet the exception for futility.**

AirTran claims that *Vaca*, 386 U.S. at 186, stands for the proposition that a futility

exception exists only if the union failed to fairly represent Larsen *and* Larsen brought an action against the union. Larsen has not sued the union.

The Middle District has found that "according to the Supreme Court [in *Vaca*], a breach of this nature may effectively bar an employer from asserting as a defense that a discharged employee had failed to exhaust the contract's grievance procedures." *Human v. City of Cocoa*, 2000 WL 33175455 at *4. Further:

> In *Vaca,* the Supreme Court held that where an employment contract bestows sole power to a union to invoke the higher stages of the grievance procedure, and the union wrongfully refused to process the grievance, the employer may not rely on a defense that the employee failed to exhaust administrative remedies. This is because the dispute over the employee's discharge had not been properly resolved through the contract's grievance process directly because of the union's breach of the employment contract. In *Vaca,* the employee was completely estopped from exhausting the contract's grievance mechanism. *Id.*

*Vaca* concerns an employee who failed to exhaust contractual remedies. 386 U.S. at 186. It requires in such a case that an employee prove that union as bargaining agent breached its duty of fair representation in its handling of the employee's grievance, but does not, as AirTran asserts, require an additional suit against the union to do so. *Id.* "The court is free to determine whether the employee is barred by the actions of his union representative, and, if not, to proceed with the case." *Id.* 186-187. In *Human*'s application of *Vaca*, a terminated employee claimed that his attempts at arbitration were frustrated both by his municipal employer and his union, not a party to the suit. *Id.* The Court distinguished *Vaca* only in that the employee in *Human* was given the right to invoke the grievance process without the help of his union. *Id.* In the CBA at issue here, the language requires that the union begin the System Board of Adjustment process. Based on the earlier reasoning from this district in *Human* and the facts in this case of the union's treatment of Larsen, the *Vaca* standard is properly met.

AirTran has not supplied any discovery evidence to indicate why the Court's previous reasoning on the matter of futility is incorrect. In the prior Order, the Court explained its reasoning in depth, relying on *Childs v. Pennsylvania Bhd. Of Maintenance Way Employees*, 831 F.2d 429, 438-439 and *Capraro v. UPS*, 993 F.2d at 336. The Court finds today that its prior reasoning continues to control, and nothing in the discovery period between the previous Order and now has provided cause for a change. An abridged version of the Court's earlier reasoning begins with the Court's conclusion that there exists a balance between the Congressional intent that the RLA encourage minor disputes be arbitrated rather than litigated and the Congressional interest that employees like Larsen not be left remediless. The Court found that the union's aggression on the telephone to Larsen and the aggressive and controversial tone of the union's letter to the Board of Adjustment (Dkt. 26-2), which might seed animosity and prejudice toward Larsen even if he were to be granted a chance to appear before the board, make a lack of a remedy for Larsen likely. Thus, the Court found futility enough to tip the delicate balance that Congress has forged. The Court found that Larsen's rights cannot be nullified merely by agreement between AirTran and the union, and the Court worried that given the posture of the parties even an order of arbitration from the Court may end in futility. The Court concluded, "When the board or the union fails or refuses to assist a Plaintiff in pursuing a legitimate set of grievance claims, a court may, in the interest of justice, invoke an applicable exception to the RLA at 45 U.S.C. § 184, and intervene for proper resolution." *Citing Capraro*, 993 F.2d at 328.

AirTran argues that *Pyles* is controlling and that it precludes jurisdiction because Larsen did not pursue a remedy before the System Board of Adjustment. The Court thoroughly analyzed and distinguished *Pyles* in its previous Order.

AirTran has attempted to take a second crack at the argument it made in its previous Motion to Dismiss without offering any of the damaging new evidence on discovery it promised. There is nothing to persuade the Court that the reasoning of its previous Order should be changed. Summary judgment as to the jurisdictional question is thus **DENIED**.

**C. AirTran argues that even if RLA preemption does not exist, Larsen's contract claim is not supported by the plain language of Section 11.C of the agreement, and even if this section were ambiguous, extrinsic evidence shows that the LTD insurance purchased by AirTran is faithful to what the union bargained for when the agreement was created.**

This argument centers on the interpretation of 11.C of the CBA. The subsection is titled "Disability Insurance." The subsection is broken into two parts. In the first part, a pilot on an "extended medical leave of absence in accordance with Section 9 of this agreement, and, if requested, can show verification by a qualified aeromedical examiner of unfitness of duty" may receive "Disability pay." CBA 11.C.2 deals with LTD, stating in relevant part that "Long Term Disability Insurance will be provided by the Company to all pilots covered under this agreement until the age of sixty-five (65), with benefits not less than those in effect on the date of the signing of this Agreement."

In Count I of its First Amended Complaint, Larsen argues that verification by a qualified aeromedical examiner of unfitness for duty is the only criterion stated for qualifying for a disability. He theorizes that disability under 11.C.2 should be defined as it is under 11.C.1, and as such his denial by the LTD carrier indicates that AirTran purchased LTD insurance that was not in compliance with the CBA. AirTran argues that Larsen is mixing and matching two different CBA provisions, and it classifies the first provision as providing "Loss of License" coverage. According to AirTran, the LTD benefit in 11.C.2 is different. AirTran further argues that 11.A.8 of the CBA, which allows the union to gain copies of insurance contracts or

agreements, indicates that qualifications or specific terms of the LTD won't be included in the CBA.

"Contract interpretation is generally a question of law." *Lawyers Title Ins. Corp. v. JDC (America) Corp.*, 52 F.3d 1575, 1580 (11th Cir. 1995) (*citing Gibbs v. Air Canada*, 810 F.2d 1529, 1532 (11th Cir. 1987); *BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 955 F.2d 1467, 1477 (11th Cir. 1992); *Zaklama v. Mount Sinai Medical Ctr.*, 906 F.2d 650, 652 (11th Cir. 1990)). "Questions of fact arise only when an ambiguous contract term forces the court to turn to extrinsic evidence of the parties' intent, such as pre-contract negotiations, to interpret the disputed term." *Id.* (*citing Thorton v. Bean Contracting Co.*, 592 F.2d 1287, 1290 (5th Cir. 1979)).

As AirTran points out, under Florida law, "the plain meaning of the contract's language controls interpretation of the contract." *Belize Telecom, Ltd. v. Government of Belize*, 528 F.3d 1298, 1306 (11th Cir. 2008). The plain language of the contract is the best evidence of the parties' intent, which generally governs a contract's construction and interpretation. *Royal Oak Landing Homeowner's Ass'n, Inc. v. Pelletier*, 620 So.2d 786, 788 (Fla. 4th DCA 1993) (*citing Schweitzer v. Seaman*, 383 So.2d 1175 (Fla. 4th DCA 1980)). "The language being construed should be read in common with other provisions of the contract." *Id.* (*citing Triple E. Dev. Co. v. Floridagold Corp.*, 51 So.2d 435 (Fla. 1951)). But, where there is no ambiguity, the search for the parties' intent should not stray from within the four corners of the document. *Barakat v. Broward County Housing Authority*, 771 So.2d 1193, 1194 (Fla. 4th DCA 2000). "It is never the role of a trial court to rewrite a contract to make it more reasonable for one of the parties or to relieve a party from what turns out to be a bad bargain." *Id.* at 1195 (*citing Dickerson Florida, Inc. v. McPeek*, 652 So.2d 186, 187 (Fla. 4th DCA 1995)).

"Whether an ambiguity exists in a contract also is a question of law." *Smith v. Shelton*, 970 So.2d 450, 451 (Fla. 4th DCA 2007) (*citing Torwest, Inc. v. Killilea*, 942 So.2d 1019, 1020 (Fla. 4th DCA 2006); *N. Star Beauty Salon, Inc. v. Artzt*, 821 So.2d 356, 358 (Fla. 4th DCA 2006)). "Whether a document is ambiguous depends upon whether it is reasonably susceptible to more than one interpretation. However, a true ambiguity does not exist merely because a document can possibly be interpreted in more than one manner." *Id.* (*quoting Lambert v. Berkley S. Condo. Ass'n*, 680 So.2d 588, 590 (Fla. 4th DCA 1996). In determining an ambiguity, words in a contract should be given their "natural, ordinary meaning." *Key v. Allstate Ins. Co.*, 90 F.3d 1546, 1548 (11th Cir. 1996) (*citing Emergency Assoc. v. Sassano*, 664 So.2d 1000, 1003 (Fla. 2d DCA 1995); *Continental Casualty Co. v. Borthwick*, 177 So.2d 687, 689 (Fla. 1st DCA 1965)). An ambiguity "does not exist simply because a contract requires interpretation or fails to define a term." *Id.* at 1549 (*citing Dahl-Eimers*, 986 F.2d at 1382).

Where an ambiguity exists, "it is hornbook contract law" that parol evidence may be brought in to explain or clarify. *Ellinger v. U.S.*, 470 F.3d 1325, 1338 (11th Cir. 2006). "If a written contract is ambiguous or obscure in its terms, so that the contractual intention of the parties cannot be understood from a mere inspection of the instrument, extrinsic evidence of the subject matter of the contract, of the relations of the parties to each other, and of the facts and circumstances surrounding them when they entered into the contract may be received to enable the court to make a proper interpretation of the instrument." *Gilman v. John Hancock Variable Life Ins. Co.*, 2003 WL 23191098 at *8  (*quoting L'Engle v. Scottish Union & Nat'l Fire Ins. Co.*, 37 So. 462 (Fla. 1904). AirTran cites *Brotherhood of Maintenance of Way Employees v. Atchison, Topeka & Santa Fe Ry. Co.*, 138 F.3d 635, 641 (7th Cir. 1997)) as precedent for a

court acting under the RLA to utilize the parol rule exception of using extrinsic evidence to unveil a latent ambiguity.

AirTran argues that there is no ambiguity in the CBA, and by the plain meaning of the document, its interpretation is correct as a matter of law. The Court disagrees. AirTran strives to portray 11.C.1 and 11.C.2 as two wholly separate clauses, labeling the first as "Loss of License" coverage. However, there is no such label in the contract and they are both under the heading of "Disability Insurance." The Court further finds that "Loss of License" is a clearly disingenuous reading of 11.C.1, given the reasoning of a decision from an arbitrator in another employee grievance that AirTran has provided to the Court. (Dkt. 40, Exhibit C). Under that ruling, the arbitrator labels 11.C.1 "short term disability" benefits. Such a labeling further indicates that 11.C.1 and 11.C.2 are not bifurcated but instead a pair. The arbitrator routinely referred to these two provisions as short term and long term disability respectively. According to the provided arbitrator holding, a decision from 2004, AirTran attempted a similar argument to the one it is using here. The arbitrator rejected AirTran's "Loss of License" argument: "The eligibility requirement for [short term disability] under Section 11.C.1 is based on 'extended medical leave of absence in accordance with Section 9.' Verification by an aeromedical examiner appears only an optional consideration—'if requested.' Medical leave of absence under Section 9 includes leave 'for sickness or injury, or fitness for duty.' Section 9 is not limited to 'loss of license.'" (Dkt. 40, Exhibit C). The Court adopts this rejection.

In 11.C.1, AirTran offers disability pay from the company for an extended medical leave of absence under Section 9 of the CBA and under 11.C.2, the company will provide LTD

insurance with benefits "not less than those in effect on the date of the signing of this Agreement." Under 9.D.1 "Medical Leave of Absence" (as contained within the arbitator's opinion, Dkt. 40, Exhibit C), "a pilot will be granted leave of absence as a pilot for sickness or injury, or fitness for duty." Under 11.C.1, a pilot may be requested to prove this unfitness for duty through a qualified professional opinion. Under 11.C.2, there is no definition of what qualifies as a disability for the purposes of LTD, and AirTran argues it leaves qualifications for the LTD up to the insurance carrier. However, the contract does not say that, and Larsen's interpretation that the company's definition of "disability" under 11.C.1 could be understood to apply to 11.C.2 as well is plausible. As such, a pilot might expect that AirTran would purchase an LTD policy that would cover a disability that rendered the pilot medically "unfit for duty" as provided for in 9.D.1 and brought into 11.C through 11.C.1. If the Court were to hold otherwise as a matter of law, the CBA would lead to the odd result in cases like Larsen's where one medically unfit pilot on extended medical leave may receive short term benefits while another equally unfit for duty but with a long term disability may not because he or she is deemed capable of working under an insurance carrier's LTD plan. This point of ambiguity is central to the outcome of this case. The FAA has held that pursuant to the Code of Federal Regulations, Larsen does "not meet the medical standards" required to resume piloting commercial aircraft. (Dkt. 40, Exhibit A).

AirTran points to 11.A.8 of the CBA, which allows pilots to attain information about their insurance contracts. AirTran writes, "The only logical reason subpart A.8 is included in the

Agreement is so Union members could have access to information about the specific terms and conditions of their LTD coverage, which—since AirTran is not the administrator of the LTD plan—are not contained in the Agreement." (Dkt. 40). That may be so, but that has no bearing on whether AirTran in 11.C of the CBA indicated it would negotiate to buy insurance with a certain qualification level that covered pilots medically unfit to fly and failed to do so. AirTran also points to the language in 11.C.2 wherein it states it will maintaining "benefits not less than those in effect on the date of the signing of this Agreement." The Court does not dispute that it has done so. However, the debate is not about benefits, but qualifications. Under the same heading of "Disability Insurance," AirTran creates a definition of what qualifies as a disability under 11.C.1, and then makes no further statement about qualifications under 11.C.2. Taking the plain language of the CBA within the four corners, therein lies the ambiguity, and the reasonable cause for confusion on the part of Larsen. Even AirTran's Director of Flying, in his one conversation with Larsen, seemed confused on this point. (Dkt. 40, Exhibit A, 24:9-11).

The Court, finding an ambiguity, may now utilize extrinsic evidence to determine if there is a genuine issue of material fact such that the Motion for Summary Judgment may be defeated. AirTran, anticipating this possibility, argues that discovery evidence allows the Court to resolve the contract in its favor. Specifically, it cites to the following evidence: (1) the Agreement is an employment contract, not an insurance benefit "plan"; (2) AirTran does not administer the LTD plan, nor does AirTran maintain or exercise any discretionary authority or control over the management of the LTD plan, or disposition of the plan's assets; (3) the LTD plan at issue is the same LTD plan that was in place when the Agreement was negotiated and signed in 2001; (4) at no time since the Agreement was created has AirTran ever reduced the LTD benefits available to its pilots, nor has there been any change to the definition of "disability" contained in the plan;

and (5) a copy of the LTD policy, including qualifying requirements and definitions, was available to Larsen at any time, including on an internal Web site AirTran maintains for its employees.

Larsen's short counter with no authority offers little help. However, AirTran has not met its burden. None of those facts clears up the ambiguity and central question at issue here, namely whether the definition of what qualifies as a disability in 11.C.1 can be projected onto 11.C.2, a clause which promises benefits but does not speak to qualifications. The Court does not dispute that AirTran does not manage the LTD nor control the insurance carrier's decisions under the plan, or any of AirTran's other assertions for that matter. What AirTran does control is the negotiation of the LTD contract it purchased pursuant to the CBA. If it was required by the CBA to purchase an LTD plan that would cover pilots who are deemed medically unfit to fly, then Larsen's case may indicate that AirTran failed. Whether it was required or not is an ambiguity in the CBA, and a question of fact. Nothing in the record allows the Court to decide this question as a matter of law, and it should be properly submitted to a trier of fact.

The Court finds as a matter of law that an ambiguity in this portion of the CBA exists. The Court further finds that no evidence on record clears up the ambiguity, and, therefore, a factual question remains. Therefore, as to AirTran's contractual interpretation argument, summary judgment is **DENIED**.

**D. AirTran argues that Larsen's promissory estoppel claim fails because (i) an express contract on the LTD benefit exists; and (ii) the "reliance" Larsen alleges was unreasonable.**

AirTran argues that Larsen's promissory estoppel claim fails because an express contract exists. The general rule under Florida law is that "if the complaint on its face shows that adequate legal remedies exist, equitable remedies are not available." *Mobil Oil Corp. v. Dade County Esoil Management Co., Inc.*, 982 F.Supp. 873, 880 (S.D.Fla. 1997) (*citing H.L. McNorton v. Pan American Bank of Orlando*, 387 So.2d 393, 399 (Fla. 5th DCA 1980)). The general rule does not, however, apply to unjust enrichment. *Id.* "It is only upon a showing that an express contract exists that the unjust enrichment or promissory estoppel count fails. Until an express contract is proven, a motion to dismiss a claim for promissory estoppel or unjust enrichment on these grounds is premature." *Id.*

Larsen, without citing authority, argues that AirTran is incorrect because the ambiguity in the CBA establishes that there is no express contract. The purpose of promissory estoppel is to "provide a remedy in the absence of an enforceable contract." *Roberts v. Rayonier, Inc.*, 135 Fed.Appx. 351, 362 (11th Cir. 2005). "Florida courts have consistently held that the law will not imply or create a contract from controverted verbal exchanges where a valid written contract exists." *Dick Winning Chrysler-Plymouth of Ft. Myers, Inc. v. Chrysler Motors Corp.*, 750 F.2d 895, 900 (11th Cir. 1985) (*citing Hermanowski etc. v. Naranja Lakes Condominium*, 421 So.2d 558, 560 (Fla. DCA 1982); *Hazen v. Cobb*, 96 Fla. 151, 171 So. 853 (1928)). Therefore, reliance upon "a verbal or implied contract, in light of the existence of a valid written contract, is misplaced." *Id.* From a policy standpoint, one party should not be penalized for the poor dealings of another. *Hermanowski*, 421 So.2d at 560.

In this case, Larsen is correct, a breach of an ambiguous contract is claimed. "[A]llegations of breaches of implicit contractual provisions cannot stand as a matter of law absent contemporaneous claims of breach of express contract terms." *Burger King Corporation*

*v. Hinton, Inc.*, 203 F.Supp.2d 1357, 1361 (S.D.Fla. 2002) (*citing Insurance Concepts and Design, Inc. v. Healthplan Servs.*, 785 So.2d 1232, 1234 (Fla. 4th DCA 2001)). Here, a breach of an express contract is claimed. The matter requires a factual determination, and, therefore, any claim under AirTran's reasoning that promissory estoppel cannot stand is under Florida law premature.

AirTran also argues that Larsen's promissory estoppel claim fails because Larsen's detrimental reliance was not reasonable as a matter of law. Promissory estoppel requires the following elements: (1) a promise made by the promisor; (2) which the promisor should reasonably expect to induce action or forbearance on the part of the promisee; (3) that in fact induced such action or forbearance; and that (4) injustice can be avoided only by enforcing the promise. *West Indies Network-I, LLC v. Nortel Networks, (CALA) Inc.*, 243 Fed.Appx. 482, 485 (11th Cir. 2007) (*citing W.R. Grace and Co. v. Geodata Services, Inc.*, 547 So.2d 919, 924 (Fla. 1989)). Under the second part of the rubric, the reasonable reliance standard that AirTran debates, the Florida Supreme Court held that "the promisor is affected only by reliance which he does or should foresee, and enforcement must be necessary to avoid injustice. Satisfaction of the latter requirement may depend on the reasonableness of the promisee's reliance[.]" *Geodata*, 547 So.2d at 924. For promissory estoppel to apply, the evidence must be clear and convincing. *Id.* at 925.

Larsen claims that he asked at length about the terms of the LTD to decide whether he needed to purchase additional insurance. He claims that company officials, including the Director of Flying, assured him that benefits would be paid until age 65 if he was found unfit to fly. (Dkt. 43, ¶ 4). He further claims that these statements were buttressed by similar assurances

found in company literature received during orientation. (Dkt. 43, ¶3). AirTran offers no evidence to counteract these claims. Instead, it argues that Larsen's reliance was unreasonable because (1) the LTD coverage was to be administered by a third-party insurance carrier; (2) AirTran's obligation was to maintain the coverage in effect when the Agreement was signed; and (3) the actual LTD insurance contract maintained by AirTran pursuant to the Agreement was made available to union members so they could understand all the qualifying terms and conditions of the particular plan.

If indeed Larsen was told by company officials and provided with literature to the effect that if he was unfit to fly the company would provide him LTD, it would be hardly unreasonable to rely on such statements directly from AirTran authorities. The Court has already found the contract to be ambiguous on this point. If Larsen attempted on his own to clarify the ambiguity and received the answer that he claimed, then his reliance is reasonable. Additionally, Larsen claims he has had significant difficulty and perhaps total frustration in acquiring the plan documents from AirTran to read for himself. (Dkt. 43, ¶¶ 16, 17). As it is, since ambiguity has give rise to a question of fact concerning the meaning of the contract, promissory estoppel is preserved as a jury question. As to AirTran's argument against Larsen's promissory estoppel claim, summary judgment is **DENIED**.

## <u>CONCLUSION</u>

This Court finds that AirTran has offered no new evidence developed during discovery that would upset the Court's previous ruling on the jurisdictional matter in this case. Also, the

Court finds that the CBA language at issue in this trial is ambiguous, and its interpretation is therefore a question of fact. Finally, the Court finds that Larsen's promissory estoppel claim raises a jury question because Larsen relied on a contract that was potentially breached and because the record provides adequate evidence that the reliance was reasonable. Accordingly, it is:

**ORDERED** that Defendant AirTran's Motion for Summary Judgment (Dkt. 40) is **DENIED.** The Court will set this case for trial as soon as possible.


**DONE AND ORDERED** in Chambers in Tampa, Florida, this 21st day of April 2009.



ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT JUDGE


Copies to: All parties and counsel of record