# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**STEVEN F. LARSEN,**

        **Plaintiff,**

**v.**                                  **Case No. 8:07-cv-442-T-TBM**

**AirTran AIRWAYS, INC.,**

        **Defendant.**

                                                /

## MEMORANDUM OF DECISION

By his First Amended Complaint (Doc. 12), Steven F. Larsen ("Larsen" or
"Plaintiff") asserts three claims against AirTran Airways, Inc. ("AirTran" or "Defendant"). In
Count I, Plaintiff brings a claim pursuant to sections 502(a)(1)(B) and (3) of the Employee
Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.,* to recover benefits
due him under the AirTran disability plan, for declaratory relief, and for injunctive relief to
enjoin acts and practices in violation of the plan. In Count II, Plaintiff alleges a state law
breach of contract claim for AirTran's failure to provide long-term disability benefits as
provided for by the collective bargaining agreement with Plaintiff's union. In Count III,
Plaintiff asserts a claim for promissory estoppel. Following a non-jury trial on July 27 and
28, 2009, pursuant to Federal Rule of Civil Procedure 52, the court makes the following
findings of facts and conclusions of law.[1]

---

[1]Also before the court is AirTran's post-trial **Motion for Leave to Add Affirmative
Defenses in Strict Conformity with the Evidence Pursuant to Rule 15 (b)** (Doc. 79), and
Plaintiff's response in opposition (Doc. 92). By this motion, AirTran seeks to amend its

I.

A.

Larsen began his employment as a line pilot for AirTran on or about February 3, 2005. Larsen's employment with AirTran was subject to the provisions of a Collective Bargaining Agreement ("CBA") between AirTran and the National Pilot's Association ("NPA" or "the union"), last amended July 31, 2001. *See* Pl. Ex 1.

As amended, Section 11 of the CBA addresses insurance and loss of license benefits. As to disability benefits, it reads as follows:

C. Disability Insurance

> 1. A pilot who is on an extended medical leave of absence in accordance with Section 9 of this Agreement, and if requested can show verification by a qualified aeromedical examiner of unfitness for duty, is entitled to receive Disability pay of 50% of the Monthly Guarantee from the Company in accordance with the table below:

> [table omitted]

> 2. Long Term Disability Insurance will be provided by the Company to all pilots covered under this agreement until the age of sixty-five (65), with benefits not less than those in effect on the date of the signing of this Agreement. The Company will pay the cost for coverage of fifty percent (50%) of the pilot's normal pay. Effective January 1, 2002, the Company will pay the cost for coverage of two thirds (2/3) of the pilot's normal pay.

---

pleadings to add two affirmative defenses to Plaintiff's contract claim, namely, mitigation of damages and avoidable consequences, urging that such amendment is merited under the proof offered at trial. Upon consideration, the motion (Doc. 79) is **GRANTED**.

Pl. Ex. 1. Although they disagree over the proper construction of these provisions, the parties agree that subsection 11.C.1 addresses short-term disability benefits and subsection 11.C. 2 addresses long-term disability ("LTD") benefits.

At the time of Larsen's employ, LTD insurance was provided through the Life Insurance Company of North America ("Cigna"). According to the Group Disability Insurance Certificate,[2] disability benefits under the policy are "the lesser of 66.67% of [the pilot's] monthly Covered Earnings . . . or [the pilot's] Maximum Disability Benefit [$5,000], . . ." There is a benefit waiting period of 180 days. *See* Pl. Ex. 2 at 22. According to the SPD, disability is defined as follows:

> . . . you are Disabled if, because of Injury or Sickness, you are unable to perform the material and substantial duties of your regular occupation, or solely due to Injury or Sickness, you are unable to earn more than 80% of your Indexed Covered Earnings.
>
> After Disability Benefits have been payable for 24 months, you are Disabled if your Injury or Sickness makes you unable to perform the material and substantial duties of any occupation for which you may reasonably become qualified based on education, training or experience, or . . .

---

[2]The certificate is identified as part of the Summary Plan Description ("SPD") required by ERISA and is referred to as such herein. Pl. Ex. 2 at 35. AirTran is identified as the Plan Sponsor as well as the Plan Administrator. *Id.* According to the SPD, "[t]he Plan Administrator has authority to control and manage the operation and administration of the Plan." *Id.* Claims processing and adjudication under the Plan are delegated to the insurance company. "The Insurance Company shall have the authority, in its discretion, to interpret the terms of the Plan, to decide questions of eligibility for coverage or benefits under the Plan, and to make related findings of fact. All decisions made by the Insurance Company shall be final and binding on Participants and Beneficiaries to the full extent permitted by law." *Id.* at 36.

(Doc. 1 at 33). The SPD also provides that benefits will *not* be paid upon "revocation, restriction or non-renewal of your license, permit or certification necessary to perform the duties of your occupation . . .," unless such benefits are due solely for "Injury" or "Sickness" otherwise covered by the policy. *Id.* at 29.

In February 2005, Larsen participated in a multi-day basic indoctrination program at AirTran that was required by the Federal Aviation Administration ("FAA"). The instructors for the indoctrination were two AirTran pilots, Captain David Peck and Captain Tom Benefield. In general, the indoctrination covered matters related to company policies and procedures, flight operations, aircraft operations, and benefits. During the indoctrination, Larsen received a copy of the CBA (Pl. Ex. 1) and a 2005 Benefits Enrollment Guide (Pl. Ex. 9).

During the indoctrination, Larsen inquired about the criteria for LTD benefits and was told by either Peck or Benefield that the criteria for receiving LTD benefits was the inability to fly due to a medical reason. He maintains that, as a consequence of this information and in reliance thereon, he did not procure alternative disability coverage for himself as he had done in the past. He was not provided a copy of the SPD and it was not discussed. Under the CBA, insurance policies are available to the union and copies are available upon request.

Testimony of Captain Peck, an AirTran pilot and union member, was introduced by way of deposition. Peck could not recall Larsen or his inquiry about LTD benefits during indoctrination. Peck's practice when asked about benefits or the contract was to refer the person to the union or the company for a response. Both the union and the company were

4

brought in during the indoctrination to address benefits and the union would have provided

the pilots with a package regarding benefits available to them.[3]

After some additional training, Larsen began flying as a First Officer on or about

April 14, 2005. He continued flying until on or about August 12, 2005. He then sought

medical care because he was not feeling well, and an examination by a cardiologist on or

about August 17, 2005, revealed cardiac artery disease.[4] In accordance with FAA regulations,

Larsen "self-grounded" himself for medical reasons. On September 7, 2005, Larsen

underwent a cardiac catheterization with angioplasty and stenting of the proximal-mid left

anterior descending coronary artery. Two days later, Larsen left a message for the AirTran

Director of Flying that a six-month recovery period after such a procedure was dictated by the

FAA before he could reapply for a medical certificate.[5]

Larsen spent the next several months seeking the assistance of AirTran and the union

in obtaining disability benefits. He also sought information on what would be required for

him to reapply for medical certification. By his account, which is essentially unrefuted, he

---

[3]Larsen does not recall hearing from AirTran officials at the indoctrination. Unfortunately, on this record, the court is left to wonder what information concerning benefits was provided to the new pilots by the union or AirTran.

[4]There are no medical records before the court. Nor was the administrative record as such provided. Limited medical findings are recounted in some of Cigna's correspondences and in letters from cardiologist Brien Pierpont, M.D. Thus, a letter from Cigna recapped that a nuclear stress test in mid-August revealed apical akinesis and hypokinesis in the inferobasilar region and mid inferior wall. The left ventricular systolic function was grossly low, normal to mildly depressed. There was no evidence of ischemia. *See* Pl. Ex. 3.

[5]Plaintiff cites to regulatory requirements for a current and appropriate medical certificate under 14 C.F.R. § 61.53 as the basis for self-grounding himself. He also cites the cardiovascular and general medical standards set forth at 14 C.F.R. §§ 67.111, 67.113, 67.211, and 67.213 as the provisions disqualifying him from continuing to fly.

did not receive any assistance or an explanation about LTD benefits from either the union or AirTran.[6]

On March 23, 2006, Larsen mailed his application for LTD benefits to Cigna.

By letter dated June 23, 2006, Cigna notified Larsen that his claim for LTD benefits had been approved for a closed period of benefits from February 14, 2006, to March 6, 2006, but was otherwise denied. *See* Pl. Ex. 3. Cigna concluded that, despite Plaintiff's cardiac artery disease, the medical evidence did not support the restrictions and limitations of "no work" or continued disability after March 6, 2006.[7] *Id.*

In July 2006, Larsen initiated a grievance under §12 of the CBA. *See* Pl. Ex. 12. By his assertion, the CBA entitled him to LTD benefits until age 65, free of any limitations as set forth in the actual policy. When his further efforts at pursuing a grievance proved futile, Larsen filed suit in March 2007.[8]

Although there is no record of the same, Plaintiff underwent an FAA medical examination on July 5, 2006, and filed an application for medical certification. On August 2, 2006, the FAA notified Larsen that his application for airman medical certification was

---

[6]For advice on the matter of recertification, Larsen ultimately had to use a consultant, Pilot Medical Solutions, Inc. *See* Pl. Ex. 20.

[7]According to the notice, benefits under the LTD plan commenced February 10, 2006, following the 180-day waiting period. The six-month recovery period under the FAA protocol expired March 7, 2006. From these endpoints, Cigna somehow calculated Plaintiff's entitlement to LTD benefits for a closed period. While disagreeing with the conclusions, Plaintiff does not challenge Cigna's decision in this action.

[8]Because AirTran offered no contrary evidence, the court's prior ruling on futility and repudiation of the grievance process are affirmed and the matter is appropriately in the district court.

denied based on that examination and a review of his medical file. *See* Pl. Ex. 6. A separate

letter of the same date advised Larsen of the requirements for a special issuance medical

certificate. *See* Pl. Ex. 18. However, due to the risks inherent in undergoing another

catheterization and the lack of insurance coverage for such procedure, which his cardiologist

deemed not medically necessary, Larsen declined to undergo the further testing.

On October 2, 2006, Larsen's initial appeal was denied.[9]

On April 25, 2007, the final denial of the appeal issued.[10]

### B.

The court permitted extrinsic evidence related to the parties' intentions concerning

disability benefits under the CBA.[11] Plaintiff offers the testimony of Ron Burkhart, a pilot

---

[9]In affirming the denial of LTD benefits, Cigna indicated that its Medical Director had reviewed the medical record and concluded there were no findings to support limitations preventing Larsen from performing a light occupation and no restrictions preventing Larsen from performing his occupation as a pilot. The notice also recited Larsen's decision to not undergo an angiography that the FAA required to reinstate his license. Cigna asserted that, "[t]he FAA has not refused to reinstate your license because of your medical condition, rather, they are unable to determine if your license should be reinstated because you are refusing to undergo the necessary testing that they require." Pl. Ex. 5.

[10]Referencing a review of Larsen's complete claim file and additional submissions including letters from Dr. Pierpont dated January 22, 2007, (Pl. Ex. 17), and Dr. Coupe dated February 22, 2007, (Pl. Ex. 19), Cigna again concluded that the medical information did not support disability as defined under the policy regardless of the position of the FAA. In sum, it concluded that, "[t]here is a lack of medical documentation to support a functional impairment that would preclude you from performing your occupation as an Airline Pilot." Pl. Ex 4.

[11]The parties dispute whether the pertinent provisions of the CBA are ambiguous. In its Order on Defendant's Motion for Summary Judgment, the district court went to some length in explaining its finding of ambiguity in the disability provisions of this contract and the need for extrinsic evidence. *See* (Doc. 46 at 19-21). While not fully agreeing with that rationale, I have nonetheless permitted extrinsic evidence from both parties.

with AirTran. In 2000, he was a member of the NPA negotiating team working on a new CBA. By Burkhart's account, the criteria for eligibility for LTD benefits under proposed versions of the long-term disability provision at issue remained constant and required that a pilot had to be unable to fly for medical reasons. The intention was that such would include pilots who were unable to fly because they could not obtain or maintain FAA medical certification due to medical reasons. Burkhart concedes that this is *not* the benefit the pilots actually received once the CBA was amended. By his account, when the union lost a grievance over whether such loss of license was covered under the LTD policy, the union went out and sought such loss-of-license coverage on its own. Finally, he maintains that it was never intended that eligibility for LTD benefits be left up to the insurance company administering the plan, although that is the way that it ended up working.[12]

In contrast, Steve Kolski, an executive vice-president for AirTran, headed the company's negotiations on the July 31, 2001, amendment to the CBA (which remains in effect today). When AirTran began offering LTD benefits to all employees in January 2000, the company paid for benefits of one-half of the employee's monthly pay and the employee could pay the additional cost for benefits of two-thirds of his/her monthly pay. In the 2001 negotiations, the pilots negotiated for AirTran to pay the full cost for the enhanced benefit and, to insure that benefits would not be reduced in the future, the union also negotiated language to assure that benefits would not be reduced below the level then offered. These terms were agreed to in the July 31, 2001, amendment to the CBA. At all times since first

---

[12]Plaintiff also cites to the benefits handbook he received during the indoctrination. *See* (Pl. Ex. 9). I find, however, that it offers little, if any, extrinsic support to his position.

8

offering LTD benefits in January 2000, the company purchased the insurance and the insurance company made the determination of eligibility, and this was the case when the union and the company negotiated the amendments in 2001.[13] There was no agreement with the union to provide LTD benefits on the basis of loss of license/fitness for duty.

Captain Allen Philpot, also an AirTran pilot, was president of the NPA for about three years between 2004 and 2007. He offers nothing concerning the negotiations in 2001, but testifies that the CBA was a "bit vague" and "short in description" on short-term and long-term disability and many of the pilots were initially confused. As it worked in practice, AirTran provided the LTD insurance to all pilots but matters of eligibility were decided by the insurance company. These provisions went through the grievance process to clarify the benefits. Because fitness-to-fly benefits were not covered, he sought (unsuccessfully) to obtain a group policy offering such coverage on behalf of the union. The letter he received from Kolski in August 2007 was another later effort to clarify the distinctions between the loss-of-license/short-term benefits and LTD insurance being provided by the company. *See* Def. Ex. 9.

Laura Backus, general counsel for the NPA, offers little about the contract negotiations, but her understanding of the benefits provided under Section 11.C is consistent with AirTran's interpretation, not Larsen's. She identifies documents related to two grievances over the terms of Section 11.C to the CBA. *See* Def. Ex 11 at exs. 2-3. The

---

[13]Coverage for so-called loss of license/fitness for duty was not a part of the LTD benefit originally offered through MetLife. That LTD policy expressly noted that, "for employees whose occupation requires a license, 'loss of license' for any reason does not, in itself, constitute Disability." Def. Ex. 4 at 9.

grievance before arbitrator Paul H. Lamboley was decided in May 2004, prior to Larsen's employment with the company. Consistent with AirTran's argument in this suit, Lamboley expressly found that the company had not failed in its obligations under the CBA to provide both short-term and long-term disability. *Id.*, ex. 3 at 12.

II.

A.

As Larsen fashions his claims, Counts I and II are inextricably intertwined. By his claim for breach of contract, Larsen asserts that AirTran denied him the LTD benefits agreed to in the CBA, namely, a LTD policy with loss of license/fitness to fly benefits to age 65. He seeks as damages past and future LTD benefits through age 65 on the basis that he is unfit to fly because has lost his medical certificate due to his heart condition. Larsen's theory of liability under ERISA is predicated on the argument that AirTran, as Plan Administrator, was responsible for providing such coverage as agreed to under the CBA, and as a fiduciary with respect to the plan, it is individually liable for causing the denial of his benefits pursuant to Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B).[14] Thus, he urges that AirTran is individually liable because it breached its duty to ensure that the plan's assets were being directly administered for the benefit of the plan participants and failed to correct an erroneous interpretation of the plan by the third-party administrator, Cigna. *See* (Doc. 96 at 16). As this

---

[14]Larsen maintains that the "plan" is embodied in at least three documents -- the CBA, the SPD, and the insurance policy. AirTran urges that the CBA is merely an employment agreement and not part of the plan.

10

argument proceeds, the July 31, 2001, amendment to the CBA assured coverage for pilots deemed unfit to fly for medical reasons. As plan administrator, AirTran should have assured Cigna was offering such benefits and its failure to do so was the proximate cause of his not receiving benefits when he became unfit to fly due to his heart condition. *Id*.

As far as this claim is brought under Section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), Larsen again urges that as an ERISA fiduciary, AirTran was obliged to discharge its duties with respect to the plan solely in the interests of, and for the benefit of, plan beneficiaries and that it failed to do so by: (1) failing to inform Cigna that the definition of disabled and the criteria for LTD benefits had changed and that such change should be reflected in the insurance policy; and (2) failing to adequately monitor the performance of Cigna leading to the wrongful denial of benefits. Larsen also alleges that AirTran breached its fiduciary duties by: (1) misleading him into believing he would receive LTD benefits if he became unfit to fly; (2) failing to assist him in applying for LTD benefits; and (3) failing to inform him of the SPD or provide him with a copy of the same and later failing to provide him with a copy of the insurance policy. (Doc. 96 at 17-19). As a remedy for the breach of fiduciary duties, Larsen seeks imposition of a constructive trust on the LTD benefits he should have received to date, an order directing continued payment of LTD benefits in the future, and an order directing the amendment of the plan SPD to conform to the terms of the CBA. *Id.* at 19.

AirTran denies that it ever agreed to provide the type of LTD benefits Plaintiff seeks. It urges that such is evident from a plain reading of the unambiguous terms of the CBA. In any event, AirTran urges that it is not the appropriate party defendant on Larsen's claim for

benefits because it had no role in that decision.  Thus, it urges that Larsen's failure to sue

Cigna is fatal to his claim for benefits since Cigna possessed complete discretion over claims

administration under the plan including the determination of eligibility.  AirTran also

maintains that the CBA is merely an employment contract and not part of the plan, and in no

event has Larsen proved a breach of either the CBA or the plan.  (Doc. 95).

B.

The term "plan" means an "employee welfare benefit plan" or an "employee pension

benefit plan."[15]  *See* 29 U.S.C. § 1002(3).  The Eleventh Circuit has adopted a "flexible

analysis" for determining whether an ERISA "plan" is established.  *Whitt v. Sherman Int'l*

*Corp.*, 147 F.3d 1325, 1330 (11th Cir. 1998) (citing *Williams v. Wright*, 927 F.2d 1540, 1543

(11th Cir. 1991)).  The word "plan" simply refers to a scheme decided upon in advance.

*Pegram v. Herdrich*, 530 U.S. 211, 222-23 (2000).  A plan exists under ERISA where, "from

the surrounding circumstances a reasonable person can ascertain the intended benefits, a class

of beneficiaries, the source of financing, and procedures for receiving benefits."  *Whitt*, 147

F.3d at 1330 (quoting *Donovan v. Dillingham*, 688 F.2d 1367, 1373 (11th Cir. 1982)).

Although ERISA imposes few formal requirements on plans, it does require that the plan's

terms be in writing.  29 U.S.C. §1102 (a) (1).

---

[15]"The terms 'employee welfare benefit plan' and 'welfare plan' mean any plan, fund, or program . . . maintained by an employer . . . to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or . . . ."  29 U.S.C. § 1002(1).

Under Section 502(a)(1)(B) of ERISA, a participant or beneficiary of a plan may bring suit against the plan administrator "to recover benefits due to him under the terms of his plan . . ." 29 U.S.C. § 1132(a)(1)(B); *see also Hamilton v. Allen-Bradley Co.*, 244 F.3d 819, 824 (11th Cir. 2001) (citing *Rosen v. TRW, Inc.*, 979 F.2d 191, 193-94 (11th Cir. 1992)). This section "empowers ERISA participants and beneficiaries to bring a civil action in order to recover benefits, enforce rights to benefits, or clarify rights to future benefits due under the terms of an ERISA-governed welfare benefit plan." *Jones v. Am. Gen. Life & Acc. Ins. Co.*, 370 F.3d 1065, 1069 (11th Cir. 2004) (citations omitted). Additionally, the Eleventh Circuit has recognized "a very narrow common law doctrine under Section 502(a)(1)(B) for equitable estoppel, which is available where the plaintiff can show that (1) the relevant provisions of the plan at issue are ambiguous, and (2) the plan provider or administrator has made representations to the plaintiff that constitute an informal interpretation of the ambiguity." *Id.*

With respect to fiduciary duties, ERISA provides that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(i)(A) & (B). A fiduciary who breaches its responsibilities shall be personally liable to "make good" to the plan on any losses to the plan resulting from the breach.[16] *See* 29 U.S.C. § 1109(a). While

---

[16]That said, however, employers typically do not have a fiduciary duty towards plan beneficiaries under ERISA. *See Barnes v. Lacy*, 927 F.2d 539, 544 (11th Cir. 1991). When

the remedy for such a breach appears to flow to the plan, the Supreme Court has held that section 502(a)(3), 29 U.S.C. § 1132(a)(3), which authorizes "other appropriate equitable relief," permits an individual to seek equitable relief for the breach of fiduciary duty resulting in losses, the remedy for which is not otherwise contemplated within ERISA. *Varity Corp. v. Howe*, 516 U.S. 489, 507-15 (1996); *Hamilton*, 244 F.3d at 826. However, § 502(a)(3)(B), authorizing "other appropriate equitable relief," authorizes only those categories of relief that were typically available in equity, such as injunction, mandamus and restitution. *Mertens v Hewitt Assocs.*, 508 U.S. 248, 256-58 (1993). In *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 221 (2002), the Supreme Court reiterated that the remedies available under § 502(a)(3) are equitable only and do not extend to the award of traditional compensatory damages even if such are couched in equitable terms.

III.

A.

Initially, the court must construe the provision on disability benefits in Section 11.C of the CBA. Contract interpretation is generally a question of law, and questions of fact arise only when an ambiguous contract term forces the court to turn to extrinsic evidence of the parties' intent. *Lawyers Title Ins. Corp. v. JDC (America) Corp.*, 52 F.3d 1575, 1580 (11th Cir. 1995). Here, in addition to the contract language, on the prior finding of a latent

---

employers act as both an employer and plan administrator, however, ERISA fiduciary duties regarding plan administration attach. *Id.* Employers in this context assume fiduciary status when, and to the extent that, they function in their capacity as plan administrators, not when they conduct business that is not regulated by ERISA. *Id.*

ambiguity the court has also considered the extrinsic evidence related to the parties' intent in negotiating the July 31, 2001, amendments to the CBA. Larsen argues that the terms in subsection 11.C.1 inform subsection 11.C.2 to the extent that the eligibility criteria in subsection 11.C.1, that is, fitness for duty, is intended to apply also to the LTD benefits called for in subsection 11.C.2. By his account, the parties never intended that eligibility for such benefits be left up to an insurer.

After careful consideration, I cannot agree with this construction. The plain language of this provision reveals there are two distinct disability benefits offered under the CBA. Thus, under subsection 11.C.1, a pilot on medical leave and unfit to fly is entitled to receive short-term disability pay from the company for up to twelve months depending on his/her years of service. Under subsection 11.C.2, AirTran agrees to buy LTD insurance coverage for its pilots until age 65, period. The contract language itself does not support Larsen's construction. Nor does the entirety of the evidence support or demonstrate that the terms in 11.C.1 inform those in 11.C.2. The eligibility requirements for LTD benefits are not reflected in 11.C.2 because they were not a part of negotiated agreement amending the CBA in July 2001. Accordingly, Larsen cannot prevail on his breach of contract claim in Count II, assuming he even has such a separate claim.[17]

This conclusion is supported by the contract language and the extrinsic evidence as a whole. At the time of the negotiations leading to the July 2001 amendment to the CBA, LTD benefits were being provided by an insurance policy with eligibility criteria determined under

---

[17]To the extent that Plaintiff urges that the CBA is part of the plan, a separate state law claim for breach of contract would appear preempted by ERISA. *See* 29 U.S .C. § 1144(a); *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41 (1987); *Williams,* 927 F.2d at 1549-50.

the policy language, and the amendment to the CBA simply cannot be reasonably read to work the type of change claimed by Larsen. On the contrary, the evidence shows that LTD benefits were new to the company beginning in 2000. Such benefits were made available to all employees and provided for by a LTD insurance policy purchased by the company. The LTD policy first purchased by AirTran and in effect at the time of these negotiations expressly did not provide LTD benefits on the basis of loss of license/fitness for duty alone. Surely this was known or should have been known to the union at the time it sought to make such benefits a part of the CBA. Nevertheless, the only express changes made to that benefit resulting from the negotiations with the union related to the company paying for the full cost of the pilot's coverage and the addition of a provision to assure that the company would not reduce the benefits in the future below that then being offered. Undoubtedly, had there been an agreement to add a loss of license/fitness for duty benefit to the LTD benefit then being provided, such would have been clearly set out in the amended agreement. It was not, and I find that no such agreement was ever reached.

B.

The conclusion that AirTran and the union never negotiated a LTD benefit under the CBA for loss of license/fitness for duty resolves substantially all of Plaintiff's claims for benefits under Count I as well.[18] Clearly, the SPD does not provide LTD benefits for loss of license/fitness for duty alone and Plaintiff cannot demonstrate otherwise. To the extent that Larsen's theory of liability is predicated on AirTran's failure to provide fitness for duty

---

[18]In Count III, Plaintiff asserts a claim for promissory estoppel. That claim for benefits is examined separately below.

coverage, the claim fails whether the CBA is part of the plan or not.[19]  There simply was no

duty to provide for such benefits, nor were they provided for under the plan.

Nor can Larsen make an appropriate benefits claim under the catch-all provision of

Section 502(a)(3) for AirTran's alleged failure to provide such benefits or assure that such

were being provided by Cigna.  *See Jones*, 370 F.3d at 1073 ("the purpose of Section

502(a)(3) [is] to 'act as a safety net, offering appropriate equitable relief for injuries caused by

violations [of ERISA] that *§ 502 does not elsewhere adequately remedy.*'").

Similarly, insofar as Plaintiff repackages this argument under Section 502(a)(3) and

alleges breach of fiduciary duty by way of AirTran's failure to inform Cigna of the proper

criteria for LTD benefits or the correct definition of disability under the policy or AirTran's

alleged lack of monitoring of Cigna's claims handling, absent the obligation under the plan or

ERISA to provide coverage for such loss of license/fitness for duty benefits in the first place,

there can be no breach of fiduciary duty and the claims are without merit.[20]  In any event,

there would be no such claim for benefits pursuant to Section 502(a)(3).[21]

---

[19]Given the flexible standard applicable in this Circuit, I find the pertinent portions of the CBA are a part of AirTran's employee benefit plan.

[20]Standing alone, AirTran's decision to purchase a particular type of LTD coverage is not the type activity that invokes a fiduciary obligation under ERISA.  *See Musto v. Am. Gen. Corp.,* 861 F.2d 897, 911 (6th Cir. 1998) (providing, "[t]here is a world of difference between administering a welfare plan in accordance with its terms and deciding what those terms are to be.  A company acts as a fiduciary in performing the first task, but not the second.").  Even assuming that AirTran made a conscious decision to forego obtaining LTD insurance that included fitness-for-duty coverage, such is not an act that amounts to "administrating the plan."  Thus, the purchase of insurance coverage alone did not implicate AirTran's fiduciary obligations.

[21]Plaintiff's claim for a constructive trust, not otherwise established, is correctly understood as nothing more than a claim for money benefits in the nature of compensatory

C.

The balance of Plaintiff's claims are more troublesome.  On his claim for breach of fiduciary duty under Section 502(a)(3), Plaintiff asserts AirTran breached its fiduciary duties by: (1) misleading him into believing that he would receive LTD benefits if he became unfit to fly for medical reasons; (2) failing to assist him in applying for LTD benefits; and (3) failing to inform him of, or provide him with a copy of, the SPD and later failing to provide him with a copy of the insurance policy.  Here, as a factual matter, I am left to conclude that Plaintiff was told during his indoctrination that LTD benefits were available to pilots unable to fly for medical reasons.  That statement, while not false, was vague and somewhat misleading to a pilot concerned with maintaining FAA medical certification as it suggests broader coverage than was actually available to pilots under the plan.  By Larsen's understanding, if a pilot became unfit to fly in contemplation of the FAA regulations because of medical reasons, he was covered.  However, such was not the case.  As set forth above, Cigna's policy required proof of an inability to perform the material and substantial duties of a pilot by reason of injury or sickness.  Being medically unfit to fly alone was not sufficient.

The undisputed testimony also establishes that AirTran failed to timely provide Plaintiff with the SPD and never provided him a copy of the insurance policy after his written request.  In the circumstances of this case, the vague and misleading statement of the eligibility criteria for LTD benefits coupled with the failure to timely provide Plaintiff the

---

damages rather than equitable relief available under Section 502(a)(3).

SPD left Larsen in the dark as to his actual benefits. This is at odds with the purposes and intentions of ERISA and the disclosure obligations imposed on plan fiduciaries.[22]

As plan administrator, AirTran was obliged to discharge its duties "solely in the interest of the participants and beneficiaries . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries . . . ." 29 U.S.C. § 1104(a)(i)(A) & (B); *see also Jones*, 370 F.3d at 1071( "[o]ne of the principal purposes of ERISA is 'to protect . . . the interests of participants . . . and . . . beneficiaries . . . by establishing standards of conduct, responsibility, and obligation for fiduciaries . . .'"). One of the principal obligations of the plan administrator is the reasonable and accurate disclosure of the terms of the plan and the

_____

[22]On the record before the court, AirTran also inexplicably failed to assist Plaintiff with processing his disability claim. The unrefuted testimony from Larsen is that he sent letters and made repeated phone calls to AirTran's human resources department over a period of several months for assistance in filing for disability benefits. His inquiries went unanswered. While AirTran had delegated the claims process to Cigna, the failure to assist a participant in a plan may be actionable. *See Hamilton,* 244 F.3d at 826-27. However, in the end, Larsen demonstrates no harm from this. Here, he ultimately filed his application for LTD benefits with Cigna and the claim was processed. He does not challenge Cigna's claims processing or its decision to deny benefits. Nor does he demonstrate that any delay in making application attributable to AirTran affected the outcome. Thus, even if such failure to assist constitutes a breach of fiduciary duty, the breach is a technical one having no effect on the benefits determination and for which Plaintiff demonstrates no real substantive harm. Absent any substantive harm, I conclude Plaintiff is not entitled to relief under Section 502(a)(3) for this violation.

Similarly, there is no demonstration of substantive harm for the failure to provide a copy of the insurance policy after written demand. Further, this claim is inappropriately brought under Section 502(a)(3). ERISA provides that, for a violation of the provisions of 29 U.S.C. § 1024(b)(4), the district court, in its discretion, may hold the administrator "personally liable" to the participant in an amount up to $110 a day. *See* 29 U.S.C. § 1132(c)(1); 29 C.F.R. § 2575.502c-1. A plaintiff may sue for such relief under Section 502(a)(1)(A), 29 U.S.C. § 1132(a)(1)(A). *Welsh v. GTE Serv. Corp.,* 866 F. Supp. 1420, 1425 (N.D. Ga. 1994). Here, Plaintiff does not pursue such civil penalty remedy and, absent some substantive harm, his claim under Section 502(a)(3) for a constructive trust is unavailing.

primary source of such information is the SPD.  *See* 29 U.S.C. §§ 1021, 1022.  To this end,

ERISA mandates that:

> The administrator shall furnish to each participant, and each
> beneficiary receiving benefits under the plan, a copy of the
> summary plan description, and all modifications and changes
> referred to in section 1022(a)(1) of this title--
>     (A) within 90 days after he becomes a participant, or
> (in the case of a beneficiary) within 90 days after he first
> receive benefits, or . . .

29 U.S.C. § 1024(b)(1).[23]  Here, Larsen began his employ in February 2005 and, under the

SPD, was eligible for coverage the first month following the date of hire.  By his undisputed

testimony, he did not receive a copy of the SPD until after making a written demand for the

same by letter in November 2006.  *See* Pl. Ex. 14.  AirTran offers no valid excuse for this

breach of its duty to disclose the SPD.  The fact that the SPD may have been available for

review does not excuse the breach.  *See* 29 C.F.R. § 2520.104b-1(b)(1) (providing that plan

administrators, in fulfilling their disclosure obligations, must use measures reasonably

calculated to ensure actual receipt of the material by plan participants and such is not

accomplished by placing copies of the material in a location frequented by participants).  By

my consideration, the failure to timely provide a copy of the SPD was a clear violation of

ERISA and a breach of AirTran's duty of loyalty and prudence to its plan participants.

---

[23]Interestingly, while the SPD invites participants to contact the plan administrator for
assistance and acknowledges the participant's right to review and receive, upon written
request, copies of documents governing the plan, it makes no mention of its duty to timely
provide a copy of the SPD.  *See* Pl. Ex 2 at 16-17.

Larsen also claims AirTran breached its fiduciary duty by failing to provide him with accurate information on the eligibility criteria for LTD benefits during the indoctrination.[24]  In the circumstances, it is a closer issue whether AirTran breached a fiduciary duty in connection with the informal statement made by Peck or Benefield on the matter of eligibility for LTD benefits.  As noted above, not all undertakings by an employer implicate its fiduciary duties under ERISA.  While these pilots were selected to teach the indoctrination on behalf of AirTran and thus spoke on the company's behalf, neither was associated with the plan or any aspect of the administration of the plan.  Nor were they associated in any way with Cigna, to whom the matter of claims eligibility was delegated.  Furthermore, these pilots were not specifically tasked by AirTran to address the matter of benefits.  By Peck's unrefuted testimony, this was left to the union and the company officials who were brought in separately to address benefits.  Department of Labor regulations suggest that employee orientations in circumstances such as these do not invoke a fiduciary duty in connection with the plan.  *See* 29 C.F.R. § 2509.75-8 at D-2.  Thus, in the given circumstances, I conclude that the instructor's statement concerning eligibility criteria was not the type discretionary undertaking necessary to invoke a fiduciary duty and offers no basis for relief under Section 502(a)(3).

---

[24]An ERISA participant has the concomitant right to accurate information from the plan administrator.  As such, the withholding of information, the material misrepresentation or omission of information, or misleading communications by the plan administrator about the plan may give rise to liability under ERISA for breach of fiduciary duty.  *See Jones,* 370 F.3d at 1072.

While I find a clear violation of a duty to disclose, fashioning a remedy in these circumstances is problematic. Why AirTran failed to provide the SPD is unclear and there is no demonstration that this was a widespread occurrence or practice. Unlike a violation of the disclosure requirements of 29 U.S.C. § 1024(b)(4), there is no express statutory remedy for the failure to provide a copy of the SPD within ninety days under 29 U.S.C. § 1024(b)(1). Furthermore, not all procedural violations merit a remedy under the ERISA scheme. In the context of benefit claims, the general rule appears to be that ordinary procedural violations of ERISA do not entitle a claimant to substantive relief. *See Harris v. Pullman Std., Inc.*, 809 F.2d 1495, 1499 (11th Cir. 1987); *Blau v. Del Monte Corp.,* 748 F.2d 1348, 1354 (9th Cir. 1984) (providing that, a fiduciary's failure to comply with ERISA's procedural requirements generally does not entitle a claimant to a substantive remedy), abrogated on other grounds, *Dytrt v. Mountain State Tel. & Tel. Co.*, 921 F.2d 889, 894 n.4 (9th Cir. 1990); *see also In re Managed Care Litig.,* 185 F. Supp. 2d 1310, 1329-31 (S.D. Fla. 2002); *Bush v. Humana Health Plan of Ala., Inc.,* 973 F. Supp. 1376, 1382 (M.D. Ala. 1997). Here, Plaintiff maintains the breach supports the imposition of a constructive trust over past-due benefits and a prospective order directing the award of benefits. (Doc. 96 at 19). This is problematic for two reasons. First as set forth above, the Supreme Court in *Great-West* determined that such a purely compensatory award is unavailable under Section 502(a)(3).[25] While Plaintiff could surely command an injunction for this disclosure violation, this is not the remedy he actually

_____

[25]As a practical matter, the non-disclosure of the SPD, while offensive to ERISA's scheme, had no ultimate effect on the decision to deny Larsen benefits and alone would not seem an appropriate basis for fashioning an award of benefits under any provision of Section 502(a).

seeks.  Furthermore, after considerable review, I am obliged to conclude that the violation here, standing alone, is one left without a remedy under ERISA.

The decision in *Peralta v. Hispanic Business, Inc,* 419 F.3d 1064 (9th Cir. 2005), is instructive on the appropriate outcome for this breach.  In *Peralta,* the court found a breach of fiduciary duty in the employer/plan administrator's continuing procedural violation in failing to give employees notice of the complete termination of their LTD coverage for three months but struggled with the availability of a remedy for this breach.  *See id.* at 1072-76.  Upon the Ninth Circuit's review of the case law, it concluded that:

> [i]ndividual substantive relief under ERISA is available where an employer actively and deliberately misleads its employees to their detriment.  In such cases, wrongs will be undone and means found to make benefits available, as in *Varity*, *Blau* and *Hozier*.  Even where benefits are not available under the applicable plan, "appropriate" equitable relief may be awarded.

*Id.* at 1075.  However, under the circumstances existing in Peralta's case, the court affirmed the decision that no remedy was available under ERISA.[26]  *See id.* at 1076.

Upon careful consideration, I am obliged to find that such is the case here.  The non-disclosure in this case did not impact the benefits decision in any way.  Further, Plaintiff makes no showing of aggravated circumstances in the non-disclosure.  For all that is demonstrated, rather than a deliberate act intended to deceive Plaintiff or deprive him of

---

[26]The court found no evidence of intentional misleading or trickery or other active concealment on the employer's part.  Thus, it concluded that, "[t]he evidence is simply of negligently inadequate communications about a policy cancellation. . . . Equity often involves the weighing of wrongdoing as well as harm.  Here, the wrongful conduct did not even approach the upper end of the scale. . . . While the ERISA fiduciary had an obligation to provide timely notification to the participants . . .  no remedy is available here."  *Peralta*, 419 F.3d at 1076.

necessary information, AirTran at worst, was negligent in failing to make this disclosure. Thus, upon this record, the breach of fiduciary duty, though improper, is not one for which the court can fashion a remedy under Section 502(a)(3). If this non-disclosure of the SPD is to serve Plaintiff's purposes in obtaining benefits, it appears such must be in connection with the claim for equitable estoppel in Count III.

In Count III, Larsen asserts that AirTran should be estopped to deny his claim for benefits based on the misleading information given to him at the indoctrination. By Larsen's account, in reliance upon the misleading information provided by the instructor, he refrained from obtaining his own disability coverage as he previously had done in a former job and now he is ineligible for the same.

In opposition, AirTran urges that the equitable claim fails because here there is an express contract addressing the matter. Even if such a claim may be asserted, AirTran argues that it fails because Larsen cannot demonstrate that these non-management pilots had the actual or apparent authority to bind AirTran with respect to benefits or that he reasonably relied on the representations of these non-management pilots given the information then available to him.

According to Larsen's proposed findings and conclusions, this claim is brought under state law. However, ERISA preempts all state common-law claims relating to employee benefit plans including equitable estoppel claims. *See Kane v Aetna Life Ins.*, 893 F.2d 1283, 1285 (11th Cir. 1990). Thus, to the extent that Plaintiff purports to raise this claim under state law, it is barred. *See id.* While a state law remedy is unavailable to Plaintiff, the allegations set forth in the Amended Complaint are sufficient to raise such an equitable

estoppel claim under federal common law and the mere mislabeling of the claim does not bar this court's further consideration.[27]

Federal courts are authorized to develop a body of federal common law to govern issues in ERISA actions not covered by the act itself. *See Pilot Life*, 481 U.S. at 56. To this end, the Eleventh Circuit has recognized a narrow common-law remedy of equitable estoppel applicable in certain ERISA actions and allowing for benefit claims under Section 502(a)(1)(B). *See Jones*, 370 F.3d at 1069; *Kane*, 893 F.2d at 1285. In particular, "the court [in *Kane*] held that the federal common-law claim of equitable estoppel may be applied when an employee relies, to his detriment, on an interpretation of an ambiguous provision in a plan by a representative of that plan." *Nat'l Cos. Health Benefit Plan v. St. Joseph's Hosp.,* 929 F.2d 1558, 1571-72 (11th Cir. 1991), abrogated on other grounds, *Geissal v. Moore Med. Corp.*, 524 U.S. 74 (1998). The remedy is a narrow one and "not available to plaintiffs in cases involving oral amendments to or modifications of employee plans governed by ERISA," however, it may be available in cases where the oral representations are *interpretations* of the plan rather than modifications. *Kane*, 893 F.2d at 1285-86. In addition to establishing that the statement is in the nature of an interpretation of an ambiguous provision of the plan, the plaintiff must show that (1) the defendant misrepresented a material fact; (2) the defendant was aware of the true facts; (3) the defendant intended that the misrepresentation be acted on or had reason to believe that the plaintiff would rely on it; (4) the plaintiff did not know, nor should he have known, the true facts; and (5) the party

---

[27]The case was tried on this claim as well, without objection, and AirTran's current objections go to the merits of the claim.

asserting the estoppel reasonably and detrimentally relied on the misrepresentations. *Nat'l Cos. Health Ben. Plan,* 929 F.2d at 1572.

Here, the court has already determined that the provisions of Section 11.C of the CBA suffered from latent ambiguity. The information provided by Peck or Benefield was in the nature of their interpretation of the ambiguous provision. However, on the evidence presented, Larsen's claim fails for a want of proof. By my conclusion, even if the statement made by one of these instructors concerning the eligibility criteria for LTD benefits misled Larsen into believing that the LTD benefits provided fitness-for-duty coverage, the circumstances in this case lack the knowing deception necessary to support the claim. In *Nat'l Cos. Health Ben. Plan*, the court addressed the applicable standard used in cases involving misstatement of facts and stated, "courts look, in effect, for an intentional deception through misrepresentation - a party who, knowing the truth, misrepresents material facts." 929 F.2d at 1573 n. 14. Here, Larsen fails to demonstrate that either instructor sought to deceive him through the representation that LTD benefits were available to pilots unable to fly for medical reasons. The statement, as far as it went, was not false and there in no showing that when the instructor made it he knew the truth was otherwise.[28] Here, there is also reason to doubt that either instructor made the statement intending Larsen would act upon it and that Larsen could reasonably rely on the statement in the given circumstances. As discussed above, while these pilots were selected by AirTran as instructors and acted on the

---

[28]I can see no conceivable reason why either instructor, a fellow pilot and union member, would seek to mislead Larsen on this matter. Thus, any misrepresentation appears entirely unintended and innocent.

company's behalf in conducting the indoctrination, neither instructor was there to speak on behalf of the plan, nor did they purport do so at any time during the indoctrination.  As Peck testified, the indoctrination on benefits was presented in a distinct session by the union and AirTran.  While I have credited Larsen's unrefuted testimony that the statement was made, I find no reason to doubt Peck's testimony that if he were asked such a question about benefits, he would have advised the pilot to take the matter up with the union or the company when they addressed benefits.  If Larsen failed to inquire further at that session of the union representative or company official addressing benefits, he did so at his own risk.

IV.

In sum, while AirTran evidences an apparent lack of understanding and concern with its obligations under ERISA as a plan administrator, it has not breached the plan as alleged and, while it has failed to act in the best interest of its participant, the violations do not permit Plaintiff the award of benefits he seeks.  The verdict in this non-jury trial is for the Defendant.  The Clerk shall enter judgment accordingly.  The judgment shall include the court's considered decision that each party shall bear their own fees and costs in this action.  Any other ruling in the circumstances of this case would invoke an unfair and inequitable result.

Done and Ordered at Tampa, Florida this 14th day of December 2009.

THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
Counsel of Record